**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEPHEN G. SMITH,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No.: 10-1417.** |
| | ) | |
| **R.R. DONNELLEY AND SONS COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S TRIAL BRIEF**

## I.    INTRODUCTION

Defendant R.R. Donnelley & Sons Co. (hereafter "R.R. Donnelley") is a global provider of integrated communications, including premedia, printing, logistics and business process outsourcing.  Plaintiff Stephen Smith worked as an assistant press operator at R.R. Donnelley's Steelway Plant in Lancaster, Pennsylvania.  Smith has sued R.R. Donnelley for wrongful discharge under Pennsylvania common law.  Smith claims that he was involved in a "head to head" collision with one of his co-workers, Amanda Sierra, which necessitated emergency surgery to repair detached retinas in both eyes.  According to Smith, R.R. Donnelley terminated his employment for reporting that injury, which he claims constituted worker's compensation retaliation.

R.R. Donnelley, however, actually terminated Smith's employment because an investigation revealed that Smith lied and that no such collision occurred.  Specifically, Sierra had no recollection of any collision with Smith, even when asked to jog her memory.  (*See* March 21, 2009 Email from Candido Crespo regarding Sierra interview, attached as Exhibit 1 (Sierra stating she did not "remember bumping heads with Steve," and that "she would have

remembered bumping her head against Steve's head")).  Similarly, Smith and Sierra's co-worker, Ken Engle did not see any collision or hear Smith mention it.  (*See id.* ("Ken said this is the first time he heard about this incident.")).

Additionally, Smith gave conflicting accounts of the alleged collision throughout R.R. Donnelley's investigation.  When he first reported the alleged collision to Manufacturing Supervisor Candido Crespo, Smith claimed that "he was coming out of a Print unit and had a 'Head to Head' collision with Amanda Sierra."  (March 20, 2009 Email from Candido Crespo, attached as Exhibit 2).  Just a few minutes later, though, Smith told the Steelway Plant's occupational health nurse, Clare Sterback, that the alleged collision occurred  when "he was coming out of a Print unit . . ." (March 20, 2009 Email from Clare Sterback, attached as Exhibit 3 (Smith stating that the collision occurred when "he came out of the folder . . ." (emphasis added)).  It is undisputed that the unit and the folder are completely different parts of the very large printing press that Smith worked on.  (*See* Agreed Upon Findings of Fact and Conclusions of Law, Doc. 22, at ¶ 32).

Smith also completely changed his story when he spoke with Krista Jenkins, R.R. Donnelley's Human Resources Manager for the Steelway Plant.  During that conversation, which occurred when Smith returned from leave following his eye surgery, Smith stated that the collision occurred when Sierra exited the print unit and collided with Smith, who was standing outside.  (*See* Steve Smith Separation Report, attached as Exhibit 4, at p. 1).  This statement directly contradicted Smith's earlier statements to Crespo and Sterback that he was inside the machine--and Sierra was outside--when the alleged collision occurred.

Smith even changed his story while talking with Jenkins on June 8, 2009.  During this conversation, Smith initially told Jenkins that he was standing outside the press and "was facing the front of the machine looking for someone."  (*Id.* at p. 1).  Sierra "was inside the unit, crouched down while looking at the paper."  (*Id.*).  As she exited, she banged her head against Smith's head, "right above his left ear."  (*Id.*).

This seemed odd to Jenkins for a number of reasons, not the least of which is that it would be close to impossible for the collision to occur in the manner that Smith described. Smith stands approximately six feet three inches tall, while Sierra stands only five feet three inches.  (*See* Agreed Upon Findings of Fact at ¶ 56).  As a result, it would be virtually impossible for Sierra to bang her head above Smith's left ear if he was standing up outside the unit as he claimed.

When Jenkins asked Smith how the collision could have occurred if he was facing forward, Smith changed his story once again.  This time, Smith claimed that "he was leaning forward into the unit while [Sierra] was coming out and that was when they bumped heads." (*See* Separation Report, Ex. 4, at p. 1).

Beyond these contradictory statements, Smith also did not report the collision right away. Instead, he waited eight days.  (*See* Agreed Upon Findings of Fact at ¶ 60).  Because R.R. Donnelley's policy requires that employees promptly report work-related injuries, Smith's delay cast a suspicious pall over his allegations.

Jenkins also interviewed Sierra about the alleged collision.  During this interview, Sierra was emphatic that no such collision occurred.  (*See* Separation Report at p. 2 ("Per Amanda, there was no way that she caused this and that she did not hit heads with him, bump into him nor

come in contact with him.")).  Beyond that, Sierra revealed that Smith had tried to convince her to lie.  At one point, Smith approached Sierra in R.R. Donnelley's parking lot as Sierra left work around 3 a.m., instructing Sierra to change her story or else Smith would lose his house.  (*See id.* ("Per Amanda, the same week he called her . . . he also showed up at the plant and was waiting for her outside when she got off work.")).

Based on their statements, either Smith or Sierra was lying, and Jenkins had to make a decision about whom to believe.  In Jenkins' opinion, Smith had a significant motive to lie about the injury being work-related.  After all, Smith was facing an expensive surgery and would be facing lost wages as he recovered from that surgery.  If he were able to trick R.R. Donnelley into believing that a work-related incident caused his surgery, then his surgery would have been paid for by R.R. Donnelley and he would have received payment for a portion of his lost wages in accordance with Pennsylvania's worker's compensation law.  *See* 77 P.S. §§ 431 and 531.  In contrast, Sierra had no readily apparent motive to lie.

As a result, Jenkins concluded that Smith was lying and terminated his employment in accordance with R.R. Donnelley's Corrective Action Policy, which authorizes termination for lying.  (*See* Agree Upon Findings of Fact, at ¶ 46 (" 'Being dishonest' and 'lying' are listed as terminable offenses under R.R. Donnelley's Positive Counseling Policy.")).

Smith claims, however, that Sierra lied about the collision because Sierra abused drugs.  Specifically, Smith claims that if Sierra had acknowledged the collision, she would have been subjected to a post-accident drug test, which would have revealed her abuse of marijuana and resulted in her termination.

That, however, is not true.  As Jenkins has explained, eight days had passed between the alleged collision and Smith's report.  As a result, R.R. Donnelley would not have required either employee to submit to a post-accident drug test.  R.R. Donnelley's drug testing policy limits post-accident drug tests to the 32-hour period following a workplace accident.

Smith also has no first-hand knowledge of Sierra's alleged marijuana use, only a suspicion.  (*See* Agreed Upon Findings of Fact at ¶¶ 70-71).

Most importantly, Smith never told Jenkins or anyone else at R.R. Donnelley about his suspicions concerning Sierra's alleged drug abuse, even when his continued employment was on the line.  (*See id.* at ¶ 72).

This case is set for a bench trial on the issue of liability, scheduled for April 12, 2012.  R.R. Donnelley submits this brief regarding pertinent legal issues related to the liability trial phase.

## II.      LIABILITY PHASE ISSUES

A.      <u>SMITH CANNOT ESTABLISH A PRIMA FACIE CASE OF WORKER'S COMPENSATION RETALIATION.</u>

Pennsylvania's Worker's Compensation Act ("WCA"), 77 P.S. § 1 *et seq.*, does not explicitly prohibit retaliation against individuals who attempt to obtain worker's compensation benefits.  However, in *Shick v. Shirey*, 716 A.2d 1231, 1237 (Pa. 1998), the Pennsylvania Supreme Court recognized a cause of action against an employer who terminates an employee for collecting worker's compensation benefits.

Although Pennsylvania's appellate courts have not clarified the prima facie elements of this cause of action, Federal courts applying Pennsylvania law have adopted the analytical framework applicable to employment discrimination claims under Federal anti-discrimination

laws.  *See, e.g., Deily v. Waste Mgmt. of Allentown*, 55 Fed. Appx. 605, 608 (3d Cir. 2003) ("[W]e endorse the District Court's application of the Title VII framework to Deily's retaliatory discharge claim under Pennsylvania law.").

As a result, an employee asserting a *Shick*-style wrongful discharge claim must prove the following to satisfy his prima facie burden: (1) he engaged in protected activity; (2) he suffered an adverse employment action either after or contemporaneously with the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *See id.*  In order to prove protected activity, a discharged employee must prove more than an employer's awareness of a work-related injury or the mere possibility that the employer might be liable for worker's compensation benefits.  (*See* Court's Sept. 16, 2011 Memorandum Opinion, Doc. 31, at p. 9).  Instead, the employee must prove that he "expressed [his] intent to pursue" a worker's compensation claim and was fired as a result.  (*Id.* at p. 11).

In this case, Smith's prima facie case fails because Smith did not have an intent to pursue a worker's compensation claim, nor did he express to R.R. Donnelley's management that he intended to file a such a claim.  Rather, Smith merely reported an alleged work-related injury to Sterback, who initiated the worker's compensation process by reporting that to Gallagher Bassett, R.R. Donnelley's third party administrator for worker's compensation benefits.  On March 25, 2009, Gallagher Bassett  communicated to Smith that R.R. Donnelley would not agree to pay him any worker's compensation benefits related to his injury.  Smith never appealed that decision by filing a claim petition with the Pennsylvania Worker's Compensation Bureau, not even after his termination from R.R. Donnelley.  And Smith never mentioned to Jenkins, the

decision-maker regarding Smith's termination, that he intended to file a claim petition, even after learning that his employment would be terminated.[1]  (*See* Joint Findings of Fact at ¶ 72).

Because Smith cannot demonstrate that he engaged in protected conduct, R.R. Donnelley requests that the Court enter judgment in its favor.

B.     R.R. DONNELLEY'S DECISION NOT TO CHALLENGE SMITH'S ENTITLEMENT TO COBRA DOES NOT ESTABLISH PRETEXT.

 Even if Smith's evidence were sufficient to establish a prima facie case of worker's compensation retaliation, that would not automatically entitle Smith to judgment in his favor. R.R. Donnelley terminated Smith because he lied during the course of an internal investigation, which the Court held is "a terminable offense under the company's Employee Conduct policy and a legitimate, non-retaliatory reason."  (July 8, 2011 Order, Doc. 29, at fn. 1, p. 4 (denying Smith's motion for summary judgment)); *see also Truong v. Dart Container Corp.*, Civ. Action No. 09-3348, 2010 U.S. Dist. LEXIS 114286 at *20 (E.D. Pa. Oct. 26, 2010) (attached as Exhibit 6) ("[I]t is not a violation of public policy or Pennsylvania law to terminate an employee for falsification of records with intent to deceive the company.").

As a result, Smith must prove by a preponderance of evidence that R.R. Donnelley's stated reasons for firing him are "false and that the real reason for the employment decision was" to retaliate against Smith for reporting an alleged work-related injury.  *Waldron v. SL Indus.*, 56 F.3d 491, 494 (3d Cir. 1995).  Or Smith must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" that the Court rationally finds "them 'unworthy of credence.' "  *Fuentes v. Perskie*,

---

[1] In fact, Smith did not even allege in his complaint that he informed R.R. Donnelley that he intended to file a claim petition or otherwise seek worker's compensation benefits.  (*See* Complaint, attached as Exhibit 5).

32 F.3d 759, 765 (3d Cir.1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d

509, 531 (3d Cir.1992)).

In reliance on this second prong, Smith intends to argue that R.R. Donnelley has

essentially acknowledged that Smith did not lie.  According to Smith, R.R. Donnelley requested

a series of pre-trial stipulations that Smith could have extended his R.R. Donnelley-provided

health insurance benefits through the Consolidated Budget Reconciliation Act ("COBRA"), 29

U.S.C. §§ 1161-69.  (*See* Agreed Upon Conclusions of Law, Doc. 22, at ¶¶ 15-16).  Smith argues

that because R.R. Donnelley could have challenged Smith's entitlement to COBRA benefits

claiming that he had committed gross misconduct, the stipulation of Smith's entitlement to

COBRA benefits calls into question whether R.R. Donnelley actually really believed that Smith

lied about the collision with Sierra.

These stipulations, however, do not reasonably call into question the veracity of the

stated reasons for Smith's termination.

COBRA permits employees to continue their employer-provided health insurance

benefits when an employee experiences a qualifying event.  *See* 29 U.S.C. § 1161(a).  Thus,

when the employer terminates an employee, the administrator of the employer's health insurance

plan must notify the employee of the optional availability of continuation coverage.  *See id.* at

§ 1166.  An employer, though, can require that the employee pay the full costs of the premium if

the employee opts for continued coverage.  *See id.* at § 1162(3).

Smith is correct that when an employer terminates an employee for "gross misconduct,"

the employer need not give the employee the option to continue his health insurance under

COBRA.  *See id.* at § 1163(2).  And although R.R. Donnelley certainly could have challenged

Smith's entitlement to COBRA benefits due to his termination for lying, there were several justifications for not doing so.

First, if R.R. Donnelley had challenged Smith's COBRA entitlement, it would have bore the burden of demonstrating by a preponderance of evidence that Smith actually engaged in gross misconduct.  *See, e.g., Kaiotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680 (7th Cir. 1997) (". . . [T]he employer's belief that the employee engaged in gross misconduct must be more than its honest, actual belief--the record must demonstrate that the employee did indeed engage in gross misconduct.").  This stands in stark contrast to the instant matter, in which Smith bears the burden of demonstrating that R.R. Donnelley's good faith belief that Smith was lying is a pretext for worker's compensation retaliation.  *See, e.g., Coulton v. Univ. of Pennsylvania*, No. Civ. A. 05-1446, 2006 WL 759701 at * 9 (E.D. Pa. March 21, 2006) (attached as Exhibit 7) *aff'd* 237 Fed. Appx. 741, 749 (3d Cir. 2002) (holding that the plaintiff failed to prove pretext where the employer credited allegations against the plaintiff over his denial); *Majtan v. Pilling Weck*, No. Civ. A. 99-718, 2000 WL 1386321 at *4 (E.D. Pa. Sept. 22, 2000) (attached as Exhibit 8) ("Even accepting that plaintiff was innocent of the infraction, an employer's legitimate reason for discharge need not be a correct or well founded one.").

Second, COBRA does not itself define "gross misconduct," and the courts addressing this issue have not been uniform.  Under some court decisions, Smith's termination would be deemed COBRA-disqualifying gross misconduct, while other court decisions suggest Smith's conduct did not rise to the level of gross misconduct. *See, e.g., Adkins v. United Int'l Investigative Servs., Inc.*, No. C 91-00087, 1992 U.S. Dist. LEXIS 4179 at **11-12  (N.D. Cal. Mar. 30, 1992) (attached as Exhibit 9) (finding that security guard committed gross misconduct by falsifying

duty log).  *But see Cabral v. The Olsten Corp.*, 843 F. Supp. 701, 704 (M.D. Fla. 1994) (finding

that employee's apparent falsifying of mileage reports did not amount to gross misconduct).

Third, R.R. Donnelley faced a very serious potential penalty if it was unsuccessful in

defending a decision to deny Smith COBRA eligibility.  Specifically, if a fact finder found R.R.

Donnelley failed to meet its burden of demonstrating that Smith actually engaged in willful

misconduct, R.R. Donnelley would have been forced to provide retroactive coverage to Smith

and pay a statutory penalty of $110 per day from the date of denial until entry of judgment,[2] plus

attorney's fees.  *See* 29 U.S.C. § 1132(c)(1) and (g).[3]

Because of the reversed burden of proof, the unsettled nature of the law, and the serious

consequences of losing a challenge, most prudent employers opt to allow employees COBRA

benefits, especially since doing so imposes virtually no expense on the employer.  As a result, it

would be totally inappropriate to find that R.R. Donnelley's decision not to challenge Smith's

COBRA entitlement demonstrates that R.R. Donnelley did not actually believe that Smith lied.[4]

Reading R.R. Donnelley's stipulations in this fashion would be particularly unfair under

the facts of this case.  R.R. Donnelley sought the stipulations because Smith claimed that he was

entitled to lost benefits as a remedy for R.R. Donnelley's allegedly wrongful termination of his

---

[2] For the period from June 8, 2009 through April 12, 2012, the statutory penalty would have been $114,290.

[3] Although 29 U.S.C. § 1132 only imposes a $100 per day penalty, the statutory penalty increased to $110 per day effective July 31, 2007.  *See* 29 C.F.R. § 2575.502(c)(1).

[4] To hold otherwise would violate public policy.  The purpose of COBRA is to expand access to employer-provided health insurance.  Requiring that an employer challenge an employee's entitlement to coverage on pains of waiving a defense in a subsequent discrimination lawsuit would encourage employers to deny COBRA coverage more frequently. That would defeat COBRA's statutory scheme, which, through its provisions allowing employers to pass on premium payments to employees, reversing the burden of proof and imposing significant penalties for wrongful denials, is clearly designed to discourage such employer challenges.

employment.  During his deposition, Smith claimed that he did not apply for COBRA because the premium was too expensive and, therefore, he was entitled to damages for lost benefits and/or out-of-pocket health care expenses that would have been covered under his R.R. Donnelley insurance plan.  (*See* Deposition of Stephen Smith, relevant portions attached as Exhibit 10, at 54:20 to 55:7).

R.R. Donnelley simply offered to stipulate, regarding Smith's claim of lost benefits, that had Smith applied for COBRA he could have been eligible for a substantially reduced COBRA premium due to provisions in the American Recovery and Reinvestment Act.  Smith's eligibility for COBRA benefits, therefore, was only relevant to Smith's claim for lost benefits because it established that Smith had not been harmed by his termination because had he applied for COBRA benefits, his premium would have been lower than what he paid for benefits as an R.R. Donnelley employee.  Smith has since withdrawn his claim for lost benefits, rendering the COBRA stipulations irrelevant.

Moreover, the undersigned counsel made the offer to stipulate.  Jenkins, who made the decision to terminate Smith, was not involved in the filing of the legal papers regarding that stipulation.  As a result, there is no basis to impute counsel's legal stratagem in 2011 to Jenkins' decision to terminate Smith in 2009.

In the end, the proffered stipulations regarding COBRA--which are now irrelevant--do not legitimately call into question R.R. Donnelley's stated reason for terminating Smith, *i.e.* Jenkins' good faith belief that Smith had lied during the course of an internal investigation.

### III.     CONCLUSION

R.R. Donnelley requests that the Court enter judgment in its favor on Smith's claim for wrongful discharge, awarding R.R. Donnelley its taxable costs and providing whatever further and/or additional relief that the Court deems necessary and appropriate.

Respectfully submitted,

BARLEY SNYDER LLP

Dated: April 3, 2012          _David J. Freedman_____ _____
                              Jennifer L. Craighead, Esquire
                              Pa. Attorney I.D. No. 69105
                              jcraighead@barley.com
                              David J. Freedman, Esquire
                              Pa. Attorney I.D. No. 207257
                              dfreedman@barley.com
                              126 East King Street
                              Lancaster, PA  17602-2893
                              (717) 299-5201
                                   Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing, Defendant's Trial

Brief, this 3rd day of April, 2012 has been filed electronically and is available for viewing and

downloading on the ECF System.

Kirk L. Wolgemuth, Esq.
Wolgemuth & Dunlap
P.O. Box 10305
Lancaster, PA 17605
*Attorney for Plaintiff*

BARLEY SNYDER LLP

*David J. Freedman*
Jennifer L. Craighead, Esquire
Pa. Attorney I.D. No. 69105
jcraighead@barley.com
David J. Freedman, Esquire
Pa. Attorney I.D. No. 207257
dfreedman@barley.com
126 East King Street
Lancaster, PA  17602-2893
(717) 299-5201
Attorneys for Defendant